Barbara S. HODGES, Plaintiff,

v.

STONE SAVANNAH RIVER PULP AND PAPER CORPORATION, Defendant.

Civ. A. No. 494–124.

United States District Court,
S.D. Georgia,
Savannah Division.

April 11, 1995.

Gregory V. Sapp, Calhoun & Associates, Savannah, GA, for plaintiff.

Ryburn Clay Ratterree, Painter, Ratterree, Connolly & Bart, Savannah, GA, and Philip N. Storm and Carol B. Manzoni, Ross & Hardies, Chicago, IL, for defendant.

## ORDER

EDENFIELD, Chief Judge.

Before the Court is Defendant Stone Savannah River Pulp and Paper Corporation's ("Stone") motion for summary judgment. As there are no genuine issues of material fact and Stone is due judgment as a matter of law, the Court **GRANTS** Stone's motion.

## I. BACKGROUND

The Court takes sexual discrimination cases seriously. This, however, is *not* a sexual discrimination case. Instead this case is about Plaintiff Barbara Hodges' frustration at not being able to secure the job she desired. Trained as an electrician, quite understandably, Hodges wanted to work in her field. Unfortunately for her, the electrician jobs available to her involved travel; she wanted to stay near home. Like so many job seekers, Hodges compromised—settling for a job that involved no travel, more pay and better benefits, but offered limited opportunities for an aspiring electrician.

After being rejected for an electrician position at Stone because she lacked sufficient experience, she accepted a job as an "oiler" at the plant in April 1991. Although the "oiler" position did not involve as much electrical work as she wanted, as Hodges stated at the time, she was simply content to get her foot in the door at Stone.

By March of 1992, however, her satisfaction with her job had waned and she requested a transfer from her "oiler" position to an "electrician" position. No change in pay was involved, only status and work assignments. Apparently, "oilers" were regarded around the plant as generalists. Not restricted by certain union agreements, management could assign them any task in the plant that they were trained to do, including electrical work. Unlike "oilers," however, electricians could only be assigned to perform work involving their electrical training.

It was precisely because oilers were generalists that Stone gave many new hires at the plant the title "oiler." It was also for this reason that the plant manager decided that workers would not be allowed to transfer among the various worker classifications within the plant. An "oiler" turned electrician was not as versatile as his less specialized colleagues. Stone did not want to lose the flexibility of its work force by allowing too much specialization. Furthermore, frequent transfers between worker classifications were viewed by Stone as creating a management problem in training and rehiring.

The no-transfer policy allegedly originated when Bert Newham, a pipe-fitter at the plant, tried in the Fall of 1991 to transfer into an electrician position. Pipe-fitters, like oilers, could be assigned to a variety of tasks consistent with each pipe-fitter's training. Stone decided at that time such moves from general job classifications to specific job clas-

sifications were not in the company's best interests. Despite the denial of Newham's transfer, Hodges filed her request. Like Newham's, it was denied.

Almost a year after Hodges transfer denial, in February 1993, Albert Santiago, another Stone employee, requested a transfer from oiler to welder. Stone denied this transfer as well, because it involved an employee attempting to transfer from a general position to a more specialized position. In Santiago's case, he was more qualified than the outside person that was chosen for the position, but still was not considered because of the no-transfer policy.

After her transfer was denied, Hodges filed a complaint with the Equal Employment Opportunity Commission that proved unsuccessful. After exhausting her administrative remedies and being presented with a letter to sue, Hodges filed this lawsuit.

Hodges claims that the no-transfer policy is pretextual and cloaks a scheme to keep women from becoming electricians at Stone. She points to two statements allegedly made by one manager and various statistics in an attempt to demonstrate that she has suffered sexual discrimination. She also complains that she was constructively discharged. Because she has not supplied adequate evidence to support either claim, and because the are no genuine issues of material fact present, the Court **GRANTS** Stone's motion for summary judgment.

## II. ANALYSIS

### A. Summary Judgment Standard

■ The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). The Court's analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Miller*, 957 F.2d 1575, 1578 (11th Cir.1992). Bald assertions of a factual dispute will not suffice. There must be sufficient evidence on which a jury could find for the Plaintiffs or the De-

fendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. Procedural Error

■ Generally, in assessing whether the movant should prevail on a motion for summary judgment, the Court must review the evidence and all reasonable factual inferences arising from them in the light most favorable to the non-moving party. *Welch v. Celotex*, 951 F.2d 1235, 1237 (11th Cir.1992). Here the Court is free to accept Stone's version of the facts even though it is the movant, because Hodges has erred in responding to the motion. Instead of replying to Stone's motion and attaching "statement of material facts as to which there is no genuine issue" in accordance with Local Rule 56.1, Hodges' counsel simply filed a list of factual questions that it believed were outstanding in the case. Such a response is tantamount to admitting that no factual dispute exists between the parties. *Beard v. B.J. Annis*, 730 F.2d 741, 743 (11th Cir.1984); *Industrial Tool & Supply, Inc. v. Norton Company*, No. CV 483-396, 1984 WL 1354 at *1 (S.D.Ga.1984).

The "factual statements" section of Hodges' brief is not sufficient to cure this error. It mixes fact and argument in such a way that they are indistinguishable. Without adequate support in the record such a mishmash is insufficient to defeat a well supported motion for summary judgment. *See Robertson v. Georgia Dept. of Corrections*, 725 F.Supp. 533, 537 (S.D.Ga.1989). As this Court has held previously, conclusory allegations without specific supporting facts have no probative value. *Id.*

■ Only because this Court finds employment discrimination especially invidious, does the Court look beyond the facts provided by Stone. Although the Court adheres to the principle that employment discrimination cases should be disposed of at summary judgment only with extreme caution, see *Beard*, 730 F.2d 741, 743 (11th Cir.1984), based on the facts in this case, such caution alone is not sufficient to warrant denying summary judgment here.

## C. Sexual Discrimination

 Hodges' claims fall under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000(e) *et seq.,* as amended. Title VII provides in relevant part that it is unlawful for an employer:

(1) to ... discriminate against any individual with respect to ... terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, *sex,* or national origin; or

(2) to *limit, segregate, or classify* ... employees ... in any way which would ... tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, *because of* such individual's race, color, religion, *sex,* or national origin.

42 U.S.C. § 2000(e)–2(a) (emphasis added). Title VII was enacted to prevent employment discrimination, achieve equal employment opportunity in the future, and to make victims of employment discrimination whole. *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, (11th Cir.1986). Title VII does not require, however, that employers fancy every employee's whim. It requires only that employers do not treat their employees differently based on immutable characteristics such as race or gender.

Plaintiffs can prove sexual discrimination in a variety of ways, including disparate treatment, disparate impact, and constructive discharge. Hodges attempts to show all three here.

### 1. Disparate Treatment

 A disparate treatment suit involves an employee who alleges that she has been treated less favorably than her co-workers because of some immutable characteristic such as sex. In disparate treatment cases, the plaintiff must prove discriminatory intent. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Disparate treatment can be proved with direct or indirect evidence. *Meeks v. Computer Associates International,* 15 F.3d 1013, 1019 (11th Cir.1994).

### a. Direct Evidence of Sexual Discrimination

 Direct evidence is any evidence that proves a fact in question without reliance upon inference or presumption. *See Holmes Communications v. LaSalle Telecommunications,* 876 F.2d 563, 569 (7th Cir.1989); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). It must speak directly to the discriminatory intent as well as relate to the specific action in question. *See LaSalle Telecommunications,* 876 F.2d at 569 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1988). An example of such direct evidence would be an employer's statement that he fired an employee because of her sex. *See Caban–Wheeler v. Elsea,* 904 F.2d 1549 (11th Cir.1990); *Wilson v. City of Aliceville,* 779 F.2d 631, 635 (11th Cir.1986).

 A plaintiff relying on such direct evidence must use it to prove a prima facie case of discrimination. *See Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). If the trier of fact believes the prima facie evidence, "the ultimate issue of discrimination is proved." *Id.* The defendant can rebut the prima facie evidence only by proving by a preponderance of the evidence that it would have made the same decision with or without the gender factor. *Id.* (citing *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *City of Aliceville,* 779 F.2d at 634).

### b. Indirect Evidence of Sexual Discrimination

 The indirect evidence test was first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and involves a *three tiered* analysis. Tier one requires the plaintiff to prove by a preponderance of the evidence a prima facie case of discrimination. If the plaintiff is successful, tier two is reached where the burden of production shifts to the defendant to articulate, *not prove,* a legitimate nondiscriminatory reason for the discriminatory treatment alleged. *Id.* at 802, 93 S.Ct. at 1824; *City of Aliceville,* 779 F.2d at 634. Should the de-

fendant carry this burden, the plaintiff, in tier three, has the opportunity to demonstrate by a preponderance of the evidence that the reasons proffered by the defendant were not true reasons, but merely pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. Despite the shifting burdens of proof, the ultimate burden of persuasion remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1980).

### 1. Tier One—Prima Facie Case

■ To establish a prima facie case through indirect evidence, a plaintiff may apply the four prong test articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The test provides that a Title VII complainant who claims that she was not hired for a position because of her sex can establish a prima facie case of such discrimination on indirect evidence alone by showing: (1) that she is indeed a woman, (2) that she applied for and was qualified for the position she was seeking, (3) that, despite her qualifications, she was rejected, and (4) that after her rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Taylor v. Hudson Pulp and Paper Corp.,* 788 F.2d 1455, 1459 (11th Cir.1986).

As the Supreme Court provides in footnote 13 of its opinion, this test is by no means rigid—as factual scenarios vary, so will the prongs of the test. *Id.* at 802, n. 13, 93 S.Ct. at 1824, n. 13. It is intended only as a tool to "sharpen inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 254 n. 8, 101 S.Ct. at 1094 n. 8. Accordingly, the test has been adapted in other contexts such as improper discharge, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir. 1984), and failure to promote. *Jones v. Firestone Tire and Rubber Co. Inc.,* 977 F.2d 527, 536 (11th Cir.1992). And, it would appear to be equally applicable in the instant case where an employer has denied an employee a transfer to another position within the company.

### 2. Tier Two—Nondiscriminatory Reason

■ Establishing a prima facie case yields a rebuttable presumption that the defendant discriminated against the plaintiff. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. When confronted with indirect evidence alone, to rebut the presumption the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the [defendant's action] had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1095. Since the defendant is under a burden of production, rather than persuasion, it need not "persuade the court that [it] was actually motivated by the proffered [nondiscriminatory] reasons." *Id.* at 254, 101 S.Ct. at 1094. The reasons, however, must be "clear and reasonably specific." *Id.* at 258, 101 S.Ct. at 1096.

### 3. Tier Three—Proving Pretext

■ If the defendant successfully overcomes the plaintiff's prima facie case, the plaintiff can respond by demonstrating that the reasons given by the defendant for the alleged discriminatory treatment were simply pretext and not the true reasons for the defendant's actions. The plaintiff may prove this either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

### c. Hodges' Claim of Disparate Treatment

#### 1. Direct Evidence

Hodges has offered no direct evidence to prove Stone's transfer denial was gender based. Although Hodges attributes two remarks to Gary Templeton, the head of the electrician group at the plant, and contends that Templeton harbored a negative feeling about women electricians in general, these alleged remarks and feelings are not direct evidence of sexual discrimination.

■ In the first alleged remark, Hodges contends that James Lee, a close friend of Hodges, once told her that Templeton had said that the electrical department only interviews people who they think will "fit in."

James Lee has since stated that he never made any such comment, and if he had heard such a comment about "fitting in," he would have interpreted it in a nondiscriminatory fashion. Lee has since elaborated by stating that he actually encouraged Hodges to apply for an electrician's position, and that he had never heard Templeton make a derogatory comment about women.

▪ In the second alleged remark, Hodges asserts that a co-worker, H. Vernon Morris, told Hodges that Templeton had said that there would be no women working in his department. Morris has since testified that he had no personal knowledge about the purported statement by Templeton, and that it was simply a rumor.

While the first remark about "fitting in" is not inconsistent with Templeton's deposition testimony *per se*, both Hodges' interpretation of the first remark and the second remark are. Templeton readily admits in his deposition that he seeks electricians who he thinks will work well with his group. Templeton insists that this does not have to do with gender. While Templeton acknowledges that some of the electricians at Stone do not cherish the idea of working with a woman, he has counseled them that: "They'd have to learn to live with it."

Although it is true that no women electricians have ever worked at Stone, Templeton attributes this to the small pool of qualified women applicants. During Templeton's tenure, only two women have applied at Stone for electrician positions. One was Hodges, who he felt lacked sufficient experience. The other was Barbara Pelli, who he interviewed and considered quite seriously for a position before hiring another male electrician. This by itself does not amount to sexual discrimination. *See King v. New Hampshire Dept. of Resources and Economic Development,* 562 F.2d 80, (1st Cir.1977) (man hired over woman because man had superior qualifications).

▪ Thus, the record does not support the second remark that Templeton would not hire a woman electrician; nor does it support the discriminatory spin Hodges has put on the first remark, that Templeton would not interview a woman because a woman would not "fit in" to his electrician group. Even if

the remarks were more supportable, they have little bearing on this case. First, as to the second remark, the opinions of employees or rumors about supervisors' attitudes are irrelevant unless clearly connected to the attitudes of the supervisors. *See Stone v. Galaxy Carpet Mills, Inc.,* 841 F.Supp. 1181, 1188 (N.D.Ga.1993).

Second, Hodges has failed to establish a causal nexus between the remarks and the transfer decision. *Williams v. Mead Coated Bd., Inc.,* 836 F.Supp. 1552, 1572–73 (M.D.Ala.1993). Even if the remarks could be attributed to Templeton, it is not clear from the record that Templeton had any impact on the transfer decision. The decision makers appeared to be Jim Lewis, the general manager, Bobby Sammons, the director of maintenance and engineering, and Howard Hallman, the manager of industrial relations. Third, even if certain Stone employees disliked working with women, Hodges has failed to demonstrate that Lewis, Sammons, Hallman, or even Templeton were affected by these sentiments.

Considering the above, the two remarks are not sufficient direct evidence to allow a reasonable jury to conclude that Stone discriminated against Hodges in denying her request to transfer. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### 2. Indirect Evidence

Again, *McDonnell Douglas* provides the general framework for determining whether a plaintiff, using indirect evidence alone, has established a prima facie case of discrimination. While this test is not the only way to prove sexual discrimination through indirect evidence, see, e.g. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), it is appropriate here.

▪ Applying the *McDonnell Douglas* framework, if Hodges could prove by a preponderance of the evidence that: (1) she is a woman, (2) she was qualified to transfer to the electrician position, (3) she was denied the transfer, and (4) Stone kept the position open after the denial, Hodges could establish a prima facie case of racial discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

While Hodges can demonstrate she is a woman, she was denied the transfer, and that the position was either kept open or filled with another person, it is not clear whether she was qualified for the electrician position. When she applied for an electrical position directly prior to hiring on as an oiler, Hodges had been rejected as too inexperienced for the job. Hodges has presented little evidence to demonstrate that she had gained sufficient experience during her tenure as an oiler to be qualified for an electrician position.

Even if Hodges were able to prove this qualification prong of the *McDonnell* test, Stone has provided a nondiscriminatory reason for not transferring Hodges. Stone contends that it denied Hodges' transfer because it had a no-transfer policy that applied to its employees without exception. Under this second tier Stone must only provide admissible evidence of a nondiscriminatory reason for the transfer denial. As long as a reasonable trier of fact could decide in Stone's favor based on this evidence, Stone has survived tier two. *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095. Because it is clear from the record that the no-transfer policy has been consistently applied since its inception to both women and men alike, the Court finds that Stone has passed *McDonnell's* tier two test. *See Peters v. Jefferson Chemical Co.,* 516 F.2d 447, 449 (5th Cir.1975).

Hodges, of course, contends that this no-transfer policy is simply pretextual and that her transfer was denied for discriminatory reasons. As provided above, to prevail on this third tier, Hodges would have to prove pretext either: (1) *directly,* by demonstrating that it is more likely that Hodges transfer was motivated by a purely discriminatory reason than the no-transfer policy cited by Stone, or (2) *indirectly,* by showing that Defendants reliance on the no-transfer policy to explain Hodges' transfer denial, is not worthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

In her efforts to survive this last tier, Hodges points to the contractual language in a collective bargaining agreement which applied to Hodges as an oiler. The pertinent language states that:

*If* the Company *fills* a vacancy in one Line of Progression *by transferring* to it an employee in another Line of Progression, *[then]* it will give first *consideration* to employees in other Lines of Progression who have within the past six months applied in the matter hereinbefore set forth for transfer to the job that has become vacant.

Def.Exh. 7 (emphasis added). Hodges reads this language to require Stone to allow transfers. Such a reading, however, is contrary to the plain words of the clause. Instead, the clause means that *if* Stone allows a transfer, *then* it has to give first consideration to those employees who have already applied for a transfer. This is precisely the way Stone has interpreted the clause since it was first included in the collective bargaining agreement regardless of the gender of the person seeking a transfer. Thus, this clause is not evidence that the no-transfer rule is pretextual.

The clause remains the subject of a management/Union dispute. Hodges argues, consistent with her Union representatives, that the clause at least requires Stone to *consider* every employee for transfer. Even though this issue of consideration is being debated by the Union and Stone, it has no bearing on this case, because, as stated above, the transfers have been denied irrespective of gender. Santiago, for instance, the worker who was denied a transfer after Hodges, claimed in his grievance that, like Hodges, he was not "considered" for a transfer. Thus, men and women alike have to contend with the no-transfer rule at Stone.

In a further attempt to show the no-transfer rule was pretextual, Hodges argues that Bert Newham's transfer denial was distinguishable from her own. The record, however, does not bear this out. Newham attempted to transfer from his pipe-fitter position to an electrician position. Like an oiler, a pipe-fitter could be temporarily assigned to any task he was trained to perform. Thus, both transfer requests were denied to maintain flexibility in the work force. For our purposes, Newham's denial is indistinguishable from Hodges.

### 3. Disparate Impact

Hodges also appears to be alleging that she suffered from disparate impact dis-

crimination. In such a case, the plaintiff alleges that a facially neutral test or employment practice "in fact falls more harshly on one group than another and cannot be justified by business necessity." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Unlike in disparate treatment cases, proof of motive is not required in disparate effect cases. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The focus is on the consequences of business practices, not the reasons for them.

To prevail on a disparate impact claim, the plaintiff must demonstrate either: (1) that her employer uses a particular employment practice that causes a disparate impact which the employer cannot prove is job related as to the particular position and consistent with business necessity, or (2) that the employer was alerted to an viable alternative nondiscriminatory employment practice which the employer did not adopt. 42 U.S.C. § 2000e–2(k)(1)(A); *see also Griggs,* 401 U.S. at 424, 91 S.Ct. at 849 (objective employment test found to have discriminatory effect); *Dothard v. Rawlinson,* 433 U.S. 321, 331–4, 97 S.Ct. 2720, 2727–29, 53 L.Ed.2d 786 (1977) (disparate impact found for height and weight requirements for prison guards).

Although Hodges has introduced statistics showing among other things that there are no women electricians at Stone's plant, these statistics do not even begin to show that Stone's *no-transfer policy* has a disparate effect on women. This case is about the denial of Hodges transfer, not about the failure of Stone to hire women in general. Of the three transfers denied thus far, two were for men. The Court sees no reason to discuss this allegation further.

### 4. Constructive Discharge

Finally, Hodges alleges that she was constructively discharged from her position. The legal standard in constructive discharge cases is whether or not the employer's action would make a reasonable person in the employee's position feel compelled to resign. *See Mitchell v. Humana Hospital–Shoals,* 942 F.2d 1581, 1583 (11th Cir.1991). Under this standard constructive discharge does not depend on the employer's subjective intent. *Id.*

Although Hodges may feel that she has been mistreated, there is little objective evidence of this. She says she left Stone because her electrician skills were "atrophying." While it is unfortunate that Hodges felt that she was losing her "high tech orientation," it was Hodges, after all, who first signed on as an oiler knowing that there was no guarantee that she would ever do extensive electrician work at Stone.

Furthermore, Hodges continued to work for Stone for two years after her transfer was denied and only left after she failed in her Equal Employment Opportunities Commission complaint. To recover in a constructive discharge case, an employee must claim more than mere disappointment with their job. *See Morgan v. Ford,* 6 F.3d 750, 755–56 (11th Cir.1993).

### III. CONCLUSION

Because there are no genuine issues of material fact and Hodges has not proved that she suffered sexual discrimination at the hands of Stone, the Court **GRANTS** Stone's motion for summary judgment as a matter of law.

SO ORDERED.